UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHERINE MAGERS,
             Plaintiff,

                                       No. 1:06-cv-767

-v-
                                HONORABLE PAUL L. MALONEY

UNUMPROVIDENT CORPORATION,
a/k/a PROVIDENT LIFE & ACCIDENT
INSURANCE COMPANY,
             Defendant.

_____

OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
RECORD AND DENYING DEFENDANT'S MOTION FOR JUDGMENT AFFIRMING
ERISA DETERMINATION

        This matter comes before the Court on cross motions for judgment on the record.  Plaintiff

Magers filed an action under the Employee Retirement Insurance Security Act (ERISA) for benefits

under a disability insurance policy issued by Defendant Provident Life & Accident Insurance

Company (Defendant or Provident).  Defendant filed its motion (Dkt. No. 23) for judgment

October 17, 2007.  Plaintiff Magers filed her motion (Dkt. No. 24) later the same day.  Plaintiff filed

a response (Dkt. No. 26) to Defendant's motion and Defendant filed a response (Dkt. No. 29) to

Plaintiff's motion.  Plaintiff filed a reply (Dkt. No. 30) to Defendant's response and Defendant filed

a reply (Dkt. No. 31) to Plaintiff's response.  Plaintiff also filed a supplemental submission of

authority (Dkt. No. 36).  The Court has read the submissions and has apprised itself of the

administrative record.  The Court concludes oral argument is not necessary to resolve the pending

issues.  *See* W.D. L.CIV.R. 7.2(d).

I.  BACKGROUND

        Plaintiff Magers was employed as a medical sales representative for GlaxoSmithKline

(GSK).  (A.R.at 23 - Disability Claim, Employer's Statement.)[1]  Plaintiff was covered by a group disability policy issued by Defendant Provident through GSK.  (*See* A.R. at 45-71 - Disability Policy.)  Plaintiff's last day of work with GSK was April 16, 2003.  (A.R. at 25 - Disability Claim, Physician's Statement.)  On April 23, 2003, Plaintiff submitted a short term disability form filled out by Dr. Jack Derks, her physician.  (A.R. at 1267.)  According to Dr. Derks, Plaintiff suffered from a pituitary dysfunction and his diagnosis was in progress.  (*Id.*)  On October 10, 2003, Plaintiff filed for long term disability benefits.  (A.R. at 21 - Disability Claim, Claimant's Statement.)  As part of her disability claim, Plaintiff submitted another statement from Dr. Derks.  (A.R. at 25.)  Dr. Derks included a diagnosis of pituitary dysfunction and adrenal insufficiency, which left Plaintiff weak and short of breath.  (*Id.*)  Dr. Derks stated Plaintiff should not do any work, could not perform any work activities, and was unable to do prolonged sitting , standing or lifting.  (*Id.*)   Under the terms of the policy, Plaintiff's short term benefits would expire on October 30, 2003 and her long term benefits, if approved, would begin on October 31, 2003.  (A.R. at 35 - GSK Internal correspondence dated 10-15-2003; A.R. at 419-421 - GSK correspondence with Plaintiff dated 1-9-2004.)  Plaintiff's long term benefits were initially approved on January 9, 2004 "provided that you continue to meet the policy's definition of 'Total Disability.'" (A.R. at 419.)  On December 27, 2005, Plaintiff's long term disability benefits were terminated.  (A.R. at 1195 - Benefit Termination Letter.)

Plaintiff Magers has seen a number of physicians since 2002, not all of whom are relevant

---

[1]Page numbers reference the Bates stamp of the Administrative Record.

to this action.[2]  In addition to the doctors who have examined Plaintiff, other doctors have reviewed

her medical records.  For ease of reference, the reports of the various physicians are summarized

below, generally in chronological order.

**Dr. Blevins**

On March 7, 2002, Plaintiff sought a diagnosis from the Vanderbilt Pituitary Center in

Nashville, Tennessee.  (A.R. at 312 - New Patient Consultation.)  Plaintiff was examined by Dr.

Lewis Blevins, an associate professor of Medicine and Neurological Surgery and the Director of the

Pituitary Center.  (A.R. at 313.)  In the history portion of the New Patient Consultation form, Dr.

Blevins noted Plaintiff developed post-partum thyroiditis[3] after giving birth to her son in 2000.

(A.R. at 312.)  Plaintiff "had classical laboratory and radiological studies confirming the diagnosis

and then developed hypothyroidism[4]."  (*Id.*)  Dr. Blevins noted some of the symptoms Plaintiff

suffered and treatment she received.  (*Id.*)  Dr. Blevins stated Plaintiff "has had  several MRI's [sic]

of the pituitary suggesting pituitary hyperplasia[5] and seeks our opinion for further evaluation of

pituitary function."  (*Id.*)  Dr. Blevins ran tests, including blood and insulin tolerance tests.  (A.R.

at 320.)  On March 15, 2002, Dr. Blevins wrote Plaintiff a letter in which he concluded her peak

---

[2]For example, Dr. John Delashaw provided a surgical consultation.  (A.R. at 1255 -
Delashaw Letter.)  Dr. Delashaw did not provide an independent diagnosis of Plaintiff's
condition.

[3]Thyroiditis is a swelling or inflamation of the thyroid gland.  STEDMAN'S MEDICAL
DICTIONARY 1988 (28th ed. 2006).

[4]Hypothyroidism refers to reduced production of the thyroid hormone, causing thyroid
insufficiency.  STEDMAN'S MEDICAL DICTIONARY 939 (28th ed. 2006).

[5]Hyperplasia is an abnormal increase in the number of normal cells in a tissue or organ so
that the tissue area or organ size increases.  STEDMAN'S MEDICAL DICTIONARY 925 (28th ed.
2006).

3

growth hormone and cortisol levels demonstrated normal secretions by the pituitary and adrenal glands.  (A.R. at 309 - Blevins' correspondence dated 3-15-2002.)  On April 30, 2002, Plaintiff traveled back to the Pituitary Center in Nashville for magnetic resonance imaging (MRI) of her brain.  (A.R. at 319-320.)  The MRI showed a "slight asymmetry of the pituitary gland which is believed to be within normal limits.  No definite pituitary mass is identified."  (A.R. at 320.)

In April 2003, Plaintiff returned to the Pituitary Center for a follow up visit and additional tests.  (A.R. at 323.)  According to Dr. Blevins, the tests revealed Plaintiff "does not have adrenocortical insufficiency and does not require glucocorticoid supplementation."  (*Id.*)  Dr. Blevins reported "some orthostatic symptoms[6] and also tachycardia[7]."  (*Id.*)

Plaintiff wrote a letter to Dr. Blevins in May 2003 expressing dissatisfaction with her visit in April.  (A.R. at 326 - Blevins' correspondence date 5-29-2003.)  Dr. Blevins response included a further discussion of the results of her visits.  (*Id.*)  Dr. Blevins explained his initial impression was that Plaintiff may have had lymphocytic hypophysitis[8], which was not supported by the medical evidence because lymphocytic hypophysitis will either continue to enlarge over time or will shrink and regress.  (*Id.*)  Because those expected changes were not seen, Dr. Blevins concluded Plaintiff "probably had a normal variant.  You certainly had no evidence of a pituitary tumor and there was nothing that was progressing and thus it was not precisely clear to me whether you had anything

---

[6]This refers to symptoms related to or caused by standing upright.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1361 (31st ed. 2007.)

[7]Tachycardia is a rapid beating of the heart.  STEDMAN'S MEDICAL DICTIONARY 1931 (28th ed. 2006).

[8]Lymphocytic hypophysitis is a pituitary lymphocytic reaction manifesting with the signs and symptoms of anterior pituitary insufficiency.  STEDMAN'S MEDICAL DICTIONARY 935 (28th ed. 2006).

wrong with your pituitary at all." (*Id.* at 326-327.)  Dr. Blevins explained Plaintiff's ACTH stimulated cortisol was normal and the results of the test show "normal pituitary function, normal adrenal function , and the fact that you do not require steroid replacement therapy." (*Id.* at 327.) Dr. Blevins also explained he was concerned about her orthostatic symptoms because individuals "with pituitary diseases typically do not have orthostatic symptoms." (*Id.*)

**Dr. Derks**

Dr. Jack Derks is Plaintiff's family physician.  In addition to the initial disability form submitted in April 2003, Dr. Derks submitted supplemental statements on Plaintiff's behalf to Defendant.  On January 29, 2004, Dr. Derks submitted a supplemental statement diagnosing Plaintiff with a pituitary dysfunction and corticoadrenal insufficiency and explaining that Plaintiff continued to complain of fatigue and profound weakness and that he had referred her to endocrinologists and neurosurgeons at the Oregon Health & Science University.  (A.R. at 446.)  On May 24, 2004, Dr. Derks submitted a supplemental statement diagnosing Plaintiff with ACTH producing pituitary adenoma and adrenal insufficiency and indicating Plaintiff continued to suffer from fatigue, weakness, low blood pressure and rapid heartbeats.  (A.R. at 477.[9])  Dr. Derks advised Defendant that Plaintiff had an MRI performed which showed a "left side pituitary adenoma." (*Id.*)  Dr. Derks' supplemental report dated September 16, 2004 is three pages long and generally contains the same information as his earlier reports.  (A.R. at 556,558-559.)  In the portion of the form which requests the physician to identify the primary diagnosis, Dr. Derks wrote ACTH produced pituitary adenoma, adrenal insufficiency and "postural orthostatic postural syndrome." (A.R. at 556.)  Dr. Derks includes tachycardia in his objective findings. (*Id.*)  In this report, Dr. Derks included an Estimated

_____

[9]Plaintiff's brief (Dkt. No. 25) in support of her motion mistakenly cites this document at A.R. 447.

Functional Abilities Form and indicated Plaintiff should never bend, kneel, crawl, climb stairs, or reach above her shoulder. (A.R. at 558.) Dr. Derks states Plaintiff is "unable to perform any sustained activity in a predictable manner due to orthostasis and tachycardia." (A.R. at 559.)

On January 10, 2005, Dr. Derks submitted another supplemental statement containing the same diagnosis and symptoms. (A.R. at 702, 704-705.) Dr. Derks indicated he referred Plaintiff to Dr. Friedman, an endocrinologist in California. (A.R. at 702.) Dr. Derks included the same limitation on Plaintiff's abilities and stated that her functional ability would have to be reevaluated "after her pituitary tumor has been treated." (A.R. at 704-705.) On May 25, 2005, Dr. Derks submitted a form titled "Income Protection Claim." (A.R. at 827.) In this form, Dr. Derks included a diagnosis of pituitary adenoma, adrenal insufficiency, growth hormone deficiency, and postural orthostatic tachycardia syndrome (POTS). (*Id.*) Dr. Derks sent a letter dated March 27, 2006 in which he stated Plaintiff's condition had not changed, she still suffered from the same conditions and that "she cannot return to any form of gainful employment at this time." (A.R. at 1328.) Finally, on April 10, 2006, Dr. Derks filled out another Estimated Functional Abilities Form in which he again indicated Plaintiff could not lift even one pound and could not bend, kneel, crawl, climb stairs or reach above her shoulder. (A.R. at 1232.) He indicated Plaintiff could not perform even sedentary activity as part of a work day. (A.R. at 1227.)

**Dr. Ludlam**

In February 2004, Plaintiff traveled to the Pituitary Disease Center at the Oregon Health & Science University Hospitals and Clinics in Portland, Oregon to see Dr. William Ludlam. (A.R. at 1251-1254 - Ludlam Report.) Dr. Ludlam noted her history of medical problems since the birth of her son in 2000. (*Id.* at 1251.) Dr. Ludlam performed a physical examination of Plaintiff and

reviewed the "slew of labs performed" on November 23, 2003.  (*Id.* at 1252.)  At this exam, Plaintiff

had a blood pressure measurement of 100/86 and a pulse of 78.  (*Id.*)  Dr. Ludlam stated

> The patient had several MRIs prior to coming to OHSU which showed left-side gland asymmetry.  She had 2 studies performed at OHSU, one of them was a dynamic MRI[10] performed on the 1.5 Tesla machine which showed an area of prominence and delayed fill on the left side of the gland which largely filled over time.  This is very consistent with adenoma[11].

(*Id.* at 1253.)  After reviewing her earlier tests and conducting his own examination and tests, Dr.

Ludlam concluded Plaintiff's

> underlying problem is related to a pituitary adenoma.  I believe that this adenoma is intermittently secreting ACTH.  During periods of increased release of ACTH, he [sic] has hypercotisolomia, we have caught that on multiple occasions including with very elevated levels both by salivary and serum draw in the middle of the night.  She has also had intermittent levels that were quite elevated during the day and afternoon.  Also of note, mixed with those elevated cortisols were actually low cortisols at all times of the day.  The levels of cortisol typically correspond with her symptoms.  Her very intermittent levels again, I believe, correlate with the fact that this tumor is probably intermittent in its nature.  The reasons I believe she has a very symptomatic adrenal insufficiency is that during periods of hypercortisolemia she suppresses her normal corticotrophs in the pituitary.  However, when the tumor becomes less active and is no longer producing elevated levels of ACTH, the cortisol level drops, and since her corticotrophs have been put to sleep, she actually goes into adrenal insufficiency.

(*Id.*)

Dr. Ludlam addressed the earlier tests that were inconsistent with his evaluation of Plaintiff.

Dr. Ludlam explained the stimulation tests measured longstanding adrenal insufficiency, but because

Plaintiff's tumor is intermittent, there would be frequent stimulation of the adrenals.  (*Id.*)  The

stimulation test can produce normal results, even though the patient has adrenal insufficiency.  (*Id.*)

---

[10] A dynamic MRI apparently is a series of images taken over time which can reveal change while a static MRI is a single image.

[11] An adenoma is benign epithelial neoplasm in which the tumor cells form glands or gland like structures.  STEDMAN'S MEDICAL DICTIONARY 26 (28th ed. 2006).

Dr. Ludlam also explained why typical MRIs would not reveal a pituitary adenoma.  (*Id.*)  Because such an adenoma has the same density as the pituitary, they do not stand out.  (*Id.*)  "However, these lesions often have a slight delay in their fill and if caught at the right moment on a dynamic MRI, actually are quite strikingly different from the rest of the pituitary until they have subsequently filled in with contrast and later image then one again become MRI invisible.  (*Id.* at 1253-1254.)  Dr. Ludlam recommended surgery.

**Dr. Lazzara**

Dr. Scott Lazzara examined Plaintiff in September 2004 as part of Plaintiff's application for social security benefits.  (A.R. at 1256-1258 - Lazzara Report.)  Dr. Lazzara's report does not indicate the extent to which he reviewed Plaintiff's medical history.  Dr. Lazzara's report does include a description of Plaintiff's complaints, symptoms and the results of a general physical examination.  Plaintiff's vital signs included blood pressure of 120/80 and a pulse of 96 when lying down and 80/60 with a pulse of 120 when sitting.  (A.R. at 1256.)  Dr. Lazzara concluded Plaintiff has "manifestations of mineralocorticoid[12] and adrenal insufficiency."  (*Id.* at 1258.)  He noted evidence of orthostatic changes and evidence of tachycardia.  (*Id.*)

**Dr. Friedman**

In January 2005, Plaintiff saw Dr. Theodore Friedman, an endocrinologist with Charles Drew University of Medicine and Science in Los Angeles, California.  (A.R. at 1248 - Friedman Correspondence dated 3-1-2006.)  Dr. Friedman performed a physical examination and ordered a number of lab tests.  Plaintiff's vital signs included blood pressure of 106/70 with a pulse of 56 and blood pressure of 100/70 with a pulse of 60 while standing.  (A.R. at 1247.)  Dr. Friedman reviewed

---

[12]Mineralocorticoid refers to any of the group of corticosteroids, but usually aldosterone. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1185 (31st ed. 2007.)

her medical history and discussed her examinations by Dr. Blevins and Dr. Ludlam.  (A.R. at 1244-1250 - Friedman Report.)   Dr. Friedman hypothesized Plaintiff's normal cosyntropin test administered by Dr. Blevins might have been misleading because "patient probably was on oral contraceptives, which can affect her cosyntropin test results."  (*Id.* at 1244.) Dr. Friedman provided the results of a variety of tests performed on Plaintiff and found the results "suggestive of hyporeninemic hypoaldosteronism[13]."  (*Id.* at 1246.)  Dr. Friedman acknowledged Plaintiff had found relief from cortisol treatment, but the results of some of her tests argued against adrenal dysfunction or pituitary dysfunction.  (*Id.* at 1247.)  Dr. Friedman planned to alter some of her medications and wanted to perform additional tests.  (*Id.*)  (A.R. at 1506 - MRI Report.)  In a letter dated March 1, 2006, Dr. Friedman identifies his diagnosis as "hypopituitarism[14], due to Sheehan's Syndrome and hyporeninemic hypoaldosteronism.  (A.R. at 1248.) MRIs of her pituitary gland were taken on January 26, 2005, which revealed no evidence of adenoma.  Dr. Friedman listed Plaintiff's symptoms, which included debilitating exhaustion, shortness of breath, tachycardia, low blood pressure, POTS, and others.  (*Id.*)

**Dr. Kane-Smart**

Dr. Sara Kane-Smart works at Shoreline Orthopedic & Sports Medicine Clinic in Holland Michigan.  (A.R. at 987 - Kane-Smart Report dated 1-19-2005.)  Plaintiff was referred to Dr. Kane-Smart by her treating physician, Dr. Derks for lingering back pain.  (*Id.*)  Dr. Kane-Smart examined

---

[13]Hyporeninemia refers to low levels of renin in the blood.  STEDMAN'S MEDICAL DICTIONARY 936 (28th ed. 2006).  Hypoaldosteronism references a deficiency of aldosterone which can result from a general adrenocortical insufficiency STEDMAN'S MEDICAL DICTIONARY 930 (28th ed. 2006).

[14]Hypopituitarism is a condition resulting from diminished activity of the anterior lobe of the hypophysis and inadequate secretions of one or more anterior pituitary hormones. STEDMAN'S MEDICAL DICTIONARY 935 (28th ed. 2006).

Plaintiff in January 2005.  (*Id.*)  The notes from her initial visit do not list any blood pressure, but do list a pulse of 88.  (A.R. at 987.)  Dr. Kane-Smart saw Plaintiff on follow up visits at least through August 2005. (A.R. at 982-985.)  In April 2005, Dr. Kane-Smart noted Plaintiff had improved strength.  (A.R. at 984.)  In June 2005, Dr. Kane-Smith reported Plaintiff had started growth hormone therapy and had resulted in increased stamina.  (A.R. at 983.)  Dr. Kane-Smart found Plaintiff's strength was full in her lower extremities.  (*Id.*)  Dr. Kane-Smart noted the same in an August 2005 visit and concluded Plaintiff "has made some nice improvements in her strength and mobility."  (A.R. at 982.)

**Dr. Jacobson**

Dr. Stephen Jacobson is a consulting physician for Defendant.  (Defendant's Motion at 5.) In July 2005, Dr. Jacobson reviewed Plaintiff's file and concluded Plaintiff did not have sufficient documentation to support a diagnosis of endocrine dysfunction other than hypothyroid.  (A.R. at 932.)  After reviewing additional records, in August 2005 Dr. Jacobson found Plaintiff's file presented a "confusing picture" and recommended an independent medical examination be performed.  (A.R. at 975.)

**Dr. Hatipoglu**

Defendant Provident arranged for an independent medical examination of Plaintiff with Dr. Betul Hatipoglu, an endocrinologist at the University of Illinois Medical Center in Chicago, Illinois. (A.R. at 1128-1132 - Hatipoglu Final Report.)  Dr. Hatipoglu examined Plaintiff on October 19, 2005 and issued her report on October 27.  (*Id.*)  Dr. Hatipoglu stated Plaintiff "has a very complicated history," she reviewed Plaintiff's file many times, "but it was very confusing due to the different opinions."  (A.R. at 1128.)  She also stated Plaintiff's lab test results were not clear "due

to the fact that it was impossible to know if she was on any medication during that time or not." (*Id.*) Dr. Hatipoglu does not list what she reviewed in Plaintiff's medical file, but does reference Dr. Blevins' report dated April 30, 2003, cortisol treatment in June 2003, an MRI, the surgical recommendation in 2004, and a "work up by a different endocrinologist" after which Plaintiff was placed on growth hormone replacement therapy.  (*Id.*)  Under the heading "Labs," Dr. Hatipoglu stated she "reviewed in the file" and lists the following dates with a few words summarizing the result: 1/25/05, 2/10/05, 3/4/05, 9/08/05, MRI 1/26/2005, and 12/2004.  (*Id.* at 1130.)

Dr. Hatipoglu included an assessment of three of Plaintiff's earlier diagnoses.  For the diagnosis of central hypothyroidism, Dr. Hatipoglu states she could not locate any lab test prior to the diagnosis to prove the diagnosis and recommends stopping Plaintiff's thyroid hormone treatment for six weeks to repeat the test.  (A.R. at 1131.)  For the diagnosis of adrenal insufficiency, Dr. Hatipoglu again stated she could not find any labs prior to starting cortisol, except for the one from Vanderbilt which was normal.  (*Id.*)  She recommended slowly stopping the cortisol treatment in order to have another stimulation test.  (*Id.*)  For the diagnosis of hypoaldosteronism, Dr. Hatipoglu stated the blood tests were borderline or normal, so she could not reach a conclusion.  (*Id.*)  She again recommended stopping Plaintiff's treatment to finalize a diagnosis.  (*Id.*)  Dr. Hatipoglu stated, from the information available to her, she could not conclude Plaintiff "has any of the above listed endocrine problems present.  But if she does have them, she is adequately replaced by the medications, even over replaced via GH shots and maybe thyroid medications, so her condition is not explained by the endocrine problems even if she has them."  (*Id.*)

Defendant sent a follow up letter to Dr. Hatipoglu on December 1, 2005, asking her to provide some additional information.  (A.R. at 1157.)  Dr. Hatipoglu provided a short response on

December 9, 2005.  (A.R. at 1161.)  In the response, Dr. Hatipoglu states "there is no endocrine medical diagnosis supported by the present medical information." (*Id.*)  She also stated, however, that "the physical findings are the same for all the physicians, my interpretation of the blood tests seems to be different compared to some but not all of the physicians that she has seen before." (*Id.*)  Finally, Dr. Hatipoglu stated she did not "diagnose any endocrine abnormality that will cause functional restriction on her." (*Id.*)

**Denial of Long Term Benefits**

On December 27, 2005, Defendant sent Plaintiff a letter explaining that Plaintiff did "not qualify for continued long term disability benefits according to the terms of the policy." (A.R. at 1195-1199 - Benefits Denial Letter.)  Defendant alleged its consultants reviewed Plaintiff's medical records from Dr. Derk, Dr. Friedman, Dr. Kane-Smart, Dr. Papp, Dr. Dodds, Dr. Blevins, and Dr. Marks as well as the results of the independent medical examination completed by Dr. Hatipoglu.[15] (*Id.* at 1196.)  Defendant's consultants concluded "the medical data does not support a continued physical condition causing a loss of functional capacity that would prevent you from performing the duties of any job as required by the policy under which you are insured." (*Id.*)  Defendant alleged the evidence did not support a finding that Plaintiff continued to suffer debilitating fatigue and tachycardia.  (A.R. at 1196-1197.)  Summarizing Dr. Hatipoglu's report, Defendant found Plaintiff was not disabled due to any endocrine abnormalities.  (A.R. at 1197.)

Plaintiff appealed the decision to deny her benefits through a letter dated May 2, 2006.  (A.R.

---

[15]In the letter, Defendant did not mention how the reports of Dr. Papp, Dr. Dodds, or Dr. Marks impacted their decision.  Plaintiff argued on appeal those physicians are not relevant to the action.  (A.R. at 1240.)  Plaintiff asserted Dr. John Papp treated Plaintiff for "gastrointestinal disturbances," Dr. William Dodds initially treated Plaintiff, but her problems were outside his area of expertise, and Dr. Louis Marks saw Plaintiff for anemia once in 2003.  (*Id.*)

at 1233-1243.) Plaintiff's counsel detailed the portions of Plaintiff's medical records supporting the opposite conclusion. (*Id.*) As part of her appeal, Plaintiff attached a letter dated April 21, 2006 from Dr. Friedman. (A.R. at 1250.) In that letter, Dr. Friedman states he has read the letter written by Dr. Hatipoglu in which Dr. Hatipoglu recommends ending Plaintiff's treatment of three medications. Dr. Friedman opines, if that were to happen, Plaintiff "would most likely suffer adrenal crisis which would be life threatening." (*Id.*)

**Dr. Rolla**

After receiving Plaintiff's appeal, Defendant submitted Plaintiff's file to Dr. Arturo Rolla at Beth Israel Deaconess Medical Center, a teaching hospital associated with Harvard Medical School. (A.R. at 1644-1650 - Rolla Report.) Dr. Rolla is board certified in both internal medicine and in endocrinology and metabolism. (*Id.* at 1644.) He is also an assistant clinical professor of medicine at Harvard Medical School and at Tufts University School of Medicine. (*Id.*) Dr. Rolla reviewed the medical file he was sent by Defendant (*Id.*), but did not perform a physical examination of Plaintiff. Dr. Rolla summarized Plaintiff's various diagnoses over the previous three years and stated "it is difficult for me to explain on the symptoms described by [Plaintiff] on the basis of endocrine abnormalities." (*Id.* at 1645.) Dr. Rolla then attempted to provide an opinion on each diagnoses in his area of expertise.

1. Postpartum thyroiditis. Dr. Rolla noted the various thyroid function tests performed on Plaintiff "are mostly normal indicating that her thyroid hormone treatment was adequate and she should have no symptoms attributable to her thyroid function." (A.R. at 1645.)

2. Hypothyroidism. Dr. Rolla stated Plaintiff may suffer from this affliction, "but we do not have any evidence to prove either way and we have to accept the initial diagnosis. I was

not provided the initial laboratory tests that suggested this diagnosis." (*Id.*) Dr. Rolla stated the condition should have resolved itself if it was due to thyroiditis or pituitary insufficiency and Plaintiff should have recovered after taking the replacement thyroid hormones. (*Id.*) Based on her treatment and thyroid function test results "described in her record it is not possible to explain her symptoms on a dysfunction of the thyroid gland." (*Id.*)

3. Sheehan's Syndrome. Dr. Rolla stated the diagnosis here is impossible to substantiate for a variety of reasons. (*Id.*) He concluded, with the replacement hormone treatment, Plaintiff should be feeling close to normal. (*Id.*)

4. Adrenal Insufficiency (Addison's Disease). Dr. Rolla explained many of Plaintiff's symptoms are consistent with this diagnosis, but that she has not had "electrolyte abnormalities that are characteristic of this condition," there is no mention of skin pigmentation in her file, no evidence of elevated serum ACTH and no progressive weight loss. (*Id.* at 1646.) Dr. Rolla pointed to several ACTH stimulation tests with normal results which suggest "her adrenal gland was functioning well." (*Id.*) Dr. Rolla further stated "the last evidence against this diagnosis is again the lack of response to the treatment. If her weakness and postural hypotension were due to adrenal insufficiency she should have felt much better and be back to normal." (*Id.*)

5. Pituitary Adenoma. Dr. Rolla stated this diagnosis was first made based on a radiological report which showed an area of prominence on the left side of the pituitary gland. (*Id.*) According to Dr. Rolla, the images of Plaintiff's gland since that first report have all been normal and Plaintiff has not shown any symptoms normally associated with overproduction of pituitary hormones. (*Id.*) Dr. Rolla noted Plaintiff has not experienced any pressure related problems associated with a pituitary tumor and there has been no evidence that any tumor in the area of the

pituitary has progressively grown. (*Id.*) Dr. Rolla rejected the conclusion that pituitary gland and the hypothalamus are not properly communicating. (*Id.*) Dr. Rolla concluded Plaintiff's "pituitary abnormality in the original radiological study [was] a normal variant" or that Plaintiff had a "transient, partial enlargement of the pituitary gland . . . but with time and the type of treatments she received it has gone back to normal." (*Id.*)

      6.  Pituitary dysfunction/insufficiency (Hypopituitarism). Dr. Rolla noted the diagnosis would be suspected by Plaintiff's low serum TSH. (*Id.*) However, Dr. Rolla explained hypothyroidism due to postpartum thyroiditis, another of Plaintiff's diagnoses, requires an elevation in serum TSH. (*Id.* at 1646-1647.) Dr. Rolla outlined three possible causes for pituitary dysfunction in Plaintiff's situation and then explained why each does not support the diagnosis. (*Id.* at 1647.) Dr. Rolla explained a pituitary adenoma and Sheehan's syndrome would both cause the dysfunction, but both of those diagnoses have already been ruled out. (*Id.*) The third possible cause, lymphocytic hypophysitis, typically involves complete or partial recovery and any continued insufficiency would be resolved through treatment. (*Id.*) Dr. Rolla found "strong evidences in the record against the diagnosis of pituitary insufficiency." (*Id.*) Specifically, Dr. Rolla referenced Plaintiff's ACTH tests, serum IGF tests, serum Prolactin results, serum Estradiol levels and serum Progesterone levels. (*Id.*) Finally, Dr. Rolla concluded Plaintiff's postural hypotension was unrelated to pituitary insufficiency. (*Id.*)

      7.  Hyporeninemic Hypoaldosteronism. Dr. Rolla stated elevated serum potassium is the most common manifestation of this problem, yet he could not find a single place in Plaintiff's file where she showed elevated levels of serum potassium. (*Id.*) Dr. Rolla noted the levels of serum Renin and Aldosterone were taken when Plaintiff was on mineralocorticoid replacement, which

would explain some of the lower levels of the hormones.  (*Id.*)  Finally, Dr. Rolla explained if Plaintiff suffered from this condition, she would have "improved significantly with the daily administration of Florinef," yet she continued to complain of the same symptoms during her treatment.  (*Id.*)

8. Cushing's Disease with intermittent secretion of ACTH.  Dr. Rolla noted this diagnosis was considered even though Plaintiff showed no signs of weight gain, hypertension, increase levels of blood sugar, low levels of serum potassium and there was no mention of striae (striping)  in her abdomen or thighs.  (*Id.* at 1648.)   Because Plaintiff was treated with hydrocortisone and Florinef, Plaintiff would have "significantly worsened" if her condition was characterized by an excessive production of adrenal hormones.  (*Id.*)  Dr. Rolla concluded he was "not familiar with a clinical situation in which there is hypersecretion of ACTH and hydrocortisone that is intermittent, and causes adrenal insufficiency in between."  (*Id.*)

9. Postural hypotension with tachycardia.  Dr. Rolla stated this condition could be "a manifestation of many clinical situations, most of them not due to a hormonal problem."  (*Id.*)  Dr. Rolla could find no endocrinological abnormality to explain Plaintiff's case.  (*Id.*)  Dr. Rolla noted the most frequent treatment for this condition is Florinef, which Plaintiff has been taking without improvement.  (*Id.*)

Dr. Rolla ends his letter with three conclusions.  First, he stated "the available clinical information does not substantiate an endocrine abnormality that will cause [Plaintiff] to have a total loss of functional ability."  (*Id.*)  Second, Dr. Rolla stated he could not make a list of restricted activities or other limitations without examining Plaintiff in person.  (*Id.*)  Finally, Dr. Rolla suggested Autonomic Function Tests to further evaluate Plaintiff's symptoms.  (*Id.*)

16

Defendant sent Dr. Rolla a follow up fax dated August 4, 2006, asking Dr. Rolla if he had reviewed Dr. Hatipoglu's report and whether he agreed with her report.  (A.R. at 1658.)  Dr. Rolla responded in a letter also dated August 4, indicating he reviewed Dr. Hatipoglu's report and agreed with her opinions regarding the functional restrictions and limitations on Plaintiff.  (A.R. at 1663.)

**Denial of Appeal**

Defendant sent Plaintiff's counsel a letter on August 23, 2006 denying Plaintiff's appeal of Defendant's decision to terminate Plaintiff's benefits.  (A.R. at 1685-1689.)  Defendant based its denial of the appeal upon a comprehensive review of Plaintiff's file by a Clinical Consultant on May 22, 2006, and a second review by the same consultant involving additional material on June 20, 2006.  (*Id.* at 1686.)  Defendant stated "throughout the physical therapy notes, there was no mention of profound weakness, orthostasis, or tachycardia."  (A.R. at 1687.)  Defendant also based its denial of the appeal on a review of Plaintiff's file by Dr. Rolla.  (*Id.* at 1687-1688.)

II.  LEGAL FRAMEWORK

In actions challenging the denial of benefits under ERISA, the standard of review used by a court depends on whether the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the benefit plan gives the administrator discretionary authority to determine eligibility for benefits, federal courts review a denial of benefits under the arbitrary and capricious standard.  *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003) (quoting *Sanford v. Harvard Indus., Inc.,* 262 F.3d 590, 595 (6th Cir. 2001) (citing *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996))).  As the Sixth Circuit Court of Appeals explained

the arbitrary and capricious standard of review is the least demanding form of judicial review of administrative actions. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.

Generally when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based on the evidence, for the plan administrator's decision.

*McDonald*, 347 F.3d at 168-169 (citations and quotation marks omitted). The Sixth Circuit

cautioned such review

is not, however, without some teeth. Deferential review is not no review, and deference need not be abject. In the instant case, the district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence - no matter how obscure or untrustworthy - to support a denial of a claim for ERISA benefits.

*Id.* at 172 (citations and quotation marks omitted).

A court's role is to review the *basis for the decision* made by the plan administrator. *Glenn v. Metlife*, 461 F.3d 660, 672 (6th Cir. 2006), *aff'd*, ___ U.S. ___, 2008 WL 2444796 (2008).[16] The district court must determine not whether discrete acts by the plan administrator are arbitrary and capricious, but whether the ultimate decision by the plan administrator to deny benefits was arbitrary and capricious. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). "Determining whether the plan administrator's decision was arbitrary and capricious means determining whether

---

[16]Plaintiff's supplemental submission of authority (Dkt. No. 36) informed the Court the Sixth Circuit's opinion in *Glenn* had been affirmed by the Supreme Court.

18

it was rational and in good faith, not [whether it was] right." *Dials v. SMC Coal & Terminal Co.*, 891 F.Supp. 373, 376 (E.D. Ky. 1995), aff'd, 89 F.3d 833 (6th Cir. 1996).

## III.  ANALYSIS

The parties agree the disability policy under which Plaintiff was covered grants discretionary authority to the plan administrator to determine eligibility for benefits.  (A.R. at 70; Defendant's motion at 10; Plaintiff's Brief in Support at 3).  Under the "definitions of disability" portion of the policy, the following provision is included:

> Total Disability With Residual
> During the Elimination Period and the Your Job Period, Total Disability or Totally Disabled means that the Covered Persons:
>> 1.  are unable to perform on a full-time or part-time basis each of the Important Duties of their Your Job because of an injury or Sickness that started while insured under this Policy;
>> 2.  do not work at all in any job; and
>> 3.  are under a physician's care.
> After the Your Job Period, Covered Persons will continue to be Totally Disabled if they:
>> 1.  are unable to work at all in any job for which they are or may become suited by education, training or experience; and
>> 2.  are under a Physician's care.

(*Id.*) The parties also agree when Plaintiff's disability benefits were terminated, she was in the "any job" period of the policy.  (Defendant's Motion at 12; Plaintiff's Reply at 1.)

### A.  ENDOCRINE ABNORMALITIES

Defendant denied benefits for lack of objective evidence supporting Plaintiff's diagnosis of an endocrine abnormality causing Plaintiff's loss of functional abilities.  (A.R. at 1197, 1688.)  On the record before the Court, Defendant's decision was not arbitrary or capricious.  To be clear, the Court is not deciding which of the diverging medical opinions are correct.  Rather, the Court must determine whether Defendant's decision was rational, which includes determining whether the

19

medical opinions in the record are supported by adequate evidence.  When concluding Plaintiff could not establish disability based on an endocrine abnormality, Defendant initially relied on Dr. Hatipoglu's report.  (A.R. at 1197.)  Plaintiff's concerns about Dr. Hatipoglu's report have merit.[17] Dr. Hatipoglu does not appear to have ordered any tests (A.R. at 1130), contrary to Defendant's assertion (Defendant's Motion at 6).  Dr. Hatipoglu does not list what she reviewed in Plaintiff's medical file and it is difficult from her report to determine whether she had access to Plaintiff's entire medical file.  She does reference work done by Dr. Blevins as well as tests performed in 2004 and 2005.  Dr. Hatipoglu ultimately concludes she cannot confirm the diagnoses because she has not been provided the lab results which led to Plaintiff's diagnoses and treatment.

In its denial of the appeal, Defendant relies on Dr. Rolla's report.  (A.R. at 1687-1689.)  To the extent Plaintiff succeeds in pointing out the weaknesses in Dr. Hatipoglu's report, Plaintiff fails to undermine the strength of Dr. Rolla's report.  Dr. Rolla's six page report thoroughly discusses nine separate diagnoses and explains the strengths and weaknesses of each.  Ultimately he concludes Plaintiff's medical records do not substantiate an endocrine abnormality which would result in a total loss of functional ability.  (A.R. at 1648.)  Defendant acknowledges, but rejects, the opinions of Dr. Derks and Dr. Friedman in favor of Dr. Rolla's conclusions.  Although Dr. Rolla does not discuss each and every lab result, his discussion of each diagnosis indicates a thorough review of Plaintiff's medical records.

_____

[17]Defendant attempts to persuade the Court that Dr. Hatipoglu was open-minded in her assessment and Dr. Friedman was not because she attempted to talk to Dr. Friedman, but was unable to do so before writing her report.  (Defendant's Motion at 17-18.)  Plaintiff takes umbrage with Defendant's characterization of what occurred.  (Plaintiff's Response at 7.)  Dr. Hatipoglu's letter speaks for itself.  (A.R. at 1131.)  She called Dr. Friedman, who did not get back to her.  The statement supports no inference that one party's intentions were nefarious nor an inference that the other party was necessarily fair and objective.

Several specific arguments raised in the cross motions merit discussion. Defendant justifies its decision by pointing to Dr. Blevins' report. (Defendant's Motion at 12.) Defendant never referenced Dr. Blevins' report in either the initial denial letter or the denial of the appeal as a justification for denying benefits. Defendant cannot now attempt to justify its decision post hoc using Dr. Blevins' reports. Although his reports may support Defendant's decision, it was not used as a basis for the decision to terminate benefits. Along similar lines, the fact that Defendant failed to discuss either Dr. Lazzara's report or Dr. Ludlam's report in the letters denying benefits does not render the decision per se arbitrary or capricious. However, that omission is one factor the Court must take into consideration.[18] Dr. Rolla addresses the basis for Dr. Ludlam's diagnosis of a pituitary adenoma as well as Dr. Ludlam's diagnosis of adrenal insufficiency. Although he does not specifically address the dynamic MRI and Dr. Ludlam's ACTH tests, Dr. Rolla does explain that the tests taken over time have not revealed the type of symptoms one would expect from Dr. Ludlam's diagnosis when coupled with the lack of other typical symptoms associated with patients who suffer from adrenal insufficiency and pituitary adenomas.

## B. POSTURAL ORTHOSTASIS AND TACHYCARDIA

Dr. Blevins first noticed Plaintiff's orthostatic problems and tachycardia in 2003. (A. R. At 320, 327.) Dr. Lazzara performed blood pressure tests on Plaintiff in 2004 while she was sitting and then standing and also found evidence of orthostatic changes and tachycardia. (A.R. at 1258.) After

---

[18]Defendant offers several explanations. (Defendant's Reply at 1-2.) First, Defendant alleges it discussed Dr. Lazzara's report in its response to Plaintiff's motion. Second, Defendant points out in its denial of Plaintiff's appeal, it explained it was not possible to comment on every medical report. Finally, Defendant argues Dr. Lazzara examined Plaintiff as part of her application for benefits with the Social Security Administration. Defendant suggests it need not consider Dr. Lazzara's report because no decision had been made by the SSA. Defendant's last justification makes little sense. Dr. Lazzara examined Plaintiff, made a diagnosis, and a recommendation to the SSA. His opinion should be considered and given appropriate weight.

Dr. Lazzara's report, Dr. Derks began to include tachycardia as an objective finding in his supplemental reports to Defendants.  (A.R. at 556.)  Dr. Derks opined Plaintiff was totally disabled and could not perform any sustained activity "due to orthostasis and tachycardia."  (A.R. at 559.)  Dr. Friedman performed similar tests and also concluded Plaintiff suffered from tachycardia and POTS.  (A.R. at 1248.)  Neither Dr. Hatipoglu nor Dr. Rolla concluded Plaintiff was not disabled as a result of this symptom.  Dr. Hatipoglu does not mention either orthostasis or tachycardia and did not record Plaintiff's vital signs during her physical examination.  In his assessment of this diagnosis, Dr. Rolla began by noting the condition could be caused by many things, not all of which are hormonal.  (A. R. at 1648.)  Dr. Rolla does not rule out the possibility that Plaintiff suffers from the condition, only that it cannot be explained by endocrine abnormalities.  (*Id.*)  Dr. Rolla states he "cannot make a recommendation regarding specific activities restrictions and limitations . . . without having examined [Plaintiff] in person."  (*Id.*)  He further recommended additional tests in order to better evaluate the "severity and causes of her postural hypotension."  (A.R. at 1649.)

In its letter initially terminating Plaintiff's benefits, Defendant pointed to two sets of records when addressing this particular diagnosis.  Defendant referenced office visits with Dr. Friedman in January 2005 and office visits with Dr. Derks between October 2004 and June 2005 which Defendant alleges showed normal heart rates and blood pressure.  (A.R. at 1196.)  Defendant noted the reports did not consistently mention fatigue.  (*Id.*)  Second, Defendant pointed to Plaintiff's physical therapy sessions with Dr. Kane Smart.  (A.R. at 1197.)  Defendant commented that Dr. Kane-Smart found general improvement in Plaintiff's strength and stamina.  (*Id.*)  In her appeal, Plaintiff noted multiple reports where the physician included fatigue as a symptom.  (A.R. at 1241- 1242.)  Plaintiff asserted Dr. Kane-Smart was an orthopedic physician who provided simple

22

stretching exercises for her back problems and did not provide any treatment or diagnosis that was relevant to the disability claim. (A.R. at 1242.) In the letter denying Plaintiff's appeal, Defendant concluded there is a limited assessment of Plaintiff's condition after December 2005 and "no support for the restrictions and limitations identified by Dr. Derks in April 2006. (A.R. at 1686.) Defendant again noted the physical therapy reports did not mention weakness, orthostasis or tachycardia. (A.R. at 1687.)

Three physicians who have examined Plaintiff personally have noted evidence of orthostasis and tachycardia. *See Evans*, 434 F.3d at 877 (holding that there is nothing necessarily objectionable about file reviews when making a determination of benefits and that whether a physician conducted a file review or a physical exam is just one factor a court must consider when reviewing whether a decision denying benefits was arbitrary or capricious) and *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (same). No physician has ever concluded Plaintiff's postural orthostasis and tachycardia conditions have been resolved or have responded to treatment. Dr. Rolla excluded endocrine explanations for this diagnosis, but recommended further testing and evaluation to determine its cause.[19] Such statement implies Dr. Rolla agrees that there is evidence of the condition.

Defendant ultimately disagrees with Dr. Friedman, Dr. Lazzara, Dr. Derks, and Dr. Rolla, that Plaintiff's vital signs provide evidence of the condition. Such disagreement and the resulting decision to deny benefits for disability due to orthostasis and tachycardia illustrates an arbitrary and capricious determination. Defendant's reliance on the tissue paper thin reference to Plaintiff's physical therapy reports do not bring the decision back into the realm of reasoned decision making.

---

[19]Dr. Blevins, who first noted evidence of orthostasis and tachycardia, also commented that the conditions were not likely related to Plaintiff's pituitary problem. (A.R. at 327.)

Defendant admits Plaintiff was having physical therapy for pelvic pain and sacro-iliac joint problems. (A.R. at 1686.) Plaintiff may have shown improvement for those conditions as a result of the therapy. The fact that the therapy reports did not comment on general weakness, orthostasis or tachycardia does not warrant the inference that such conditions did not exist. Plaintiff was not receiving physical therapy for those conditions. Although one might expect the physical therapist to comment on weakness, orthostasis or tachycardia, the failure to make such comment is not objective evidence of sufficient quality that those conditions do not exist in light of the opinion of multiple medical doctors to the contrary.

In its reply brief, Defendant argues Plaintiff applied for disability benefits on the basis of endocrine problems, referencing the October 2003 claim forms. (Defendants' Reply at 2.) Defendant asserts "there was never an indication that Ms. Magers was disabled . . . due to hypotension and/or tachycardia." (*Id.*) As outlined above, the record plainly contradicts Defendant's claim. Commencing 2004, more than a year before defendant's termination of benefits, Dr. Derks submitted routine supplemental forms to Defendant which included orthostatic and tachycardia and stated that those conditions rendered Plaintiff disabled *and unable to perform any job*. (A.R. at 556, 559.)


C.  WEIGHT OF THE OPINION OF TREATING PHYSICIANS

Plaintiff asserts in her motion and brief that Defendant failed to give the appropriate consideration to the opinions of Plaintiff's treating physicians. Plaintiff relies on the Sixth Circuit opinion in *Glenn v. Metlife*. In *Glenn*, the Sixth Circuit admonished the plan administrator for focusing on one form filled out by the plaintiff's treating physician, while the more detailed reports

and assessments by that physician reached different conclusions.  461 F.3d at 671-672.  The court pointed out the insurer failed to offer any explanation of how it resolved that conflict and even whether it considered the conflict important.  *Id.* at 672.  Contrary to Plaintiff's assertion, the Sixth Circuit has routinely held that a plan administrator need not afford  special deference to the opinion of a treating physician.  *Glenn*, 461 F.3d at 671.  Plan administrators need not give any special weight to the opinions of a claimant's treating physician and courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  At the same time, the plan administrator may not "arbitrarily repudiate or refuse to consider the opinions of a treating physician."  *Glenn*, 461 F.3d at 671.

Defendant certainly did not discuss the opinions of Dr. Derks or Dr. Friedman in any detail in either of its denial letters.  Both doctors are mentioned, and it is clear from the letters that their opinions were considered.  Dr. Hatipoglu and Dr. Rolla expressed disagreement with the opinions of Dr. Derks and Dr. Friedman.  With regard to endocrine abnormalities, Dr. Hatipoglu and Dr. Rolla explained why they thought the evidence did not support Plaintiff's diagnoses.  Defendant's reliance on Dr. Hatipoglu's and Dr. Rolla's reports necessarily incorporated their consideration and rejection of the opinions of Dr. Derks and Dr. Friedman.  On the record before the Court, Defendant's failure to discuss Plaintiff's treating physician's opinions in any detail is a consideration, but not one which renders Defendant's decision arbitrary or capricious with regard to Plaintiff's endocrine related condition.  On the other hand, Defendant's failure to discuss the various reports by Plaintiff's treating physicians with regard to Plaintiff's orthostatic condition and tachycardia is a factor weighing heavy in Plaintiff's favor.

### D.  CONFLICT OF INTEREST

Plaintiff argues the plan administrator and the insurer are the same entity, which results in a conflict of interest.  (Plaintiff's Brief at 21.)  Plaintiff asserts "the conflict of interest in this case is egregious - with UNUM being the entity that decides if the benefits should be paid and the entity paying those benefits.  (*Id.* at 23.)  Plaintiff refers to Dr. Hatipoglu and Dr. Rolla as Defendant's "select reviewers" (*Id.*), "pet reviewers" (*Id.* at 19) and members of the "stable of outside 'experts' that gives [Defendant] the report that it wants to have" (*Id.* at 18).  Defendant responds that Plaintiff has failed to offer any evidence, let alone any significant evidence, that the apparent conflict of interest motivated its decision.  (Defendant's Response at 3-4.)

When the insurer also acts as the plan administrator, an apparent conflict of interest exists.  *See Firestone Tire & Rubber Co.*, 489 U.S. at 115.  The conflict, does not however, alter the standard of review.  *Kalish v. Liberty Mutual*, 419 F.3d 501, 506 (6th Cir. 2005); *Calvert*, F.3d at 293. Instead, any conflict of interest must be weighed as one factor in determining whether the denial of benefits was an abuse of discretion.  *Id.* (citing *Firestone Tire and Rubber Co.*, 489 U.S. at 115).  *See Glenn v. Metlife*, ___ U.S.___, 2008 WL 2444796 *7-8 (June 19, 2008).  "The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision."  *Evans,* 434 F.3d at 876 (citing *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n. 2 (6th Cir. 2004)).  "[T]here must be some significant evidence in the record that the insurer was motivated by self interest, and the plaintiff bears the burden to show that a significant conflict was present."  *Smith v. Continental Casualty Co.*, 450 F.3d 253, 260 (6th Cir. 2006).  *See also Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 165 (6th Cir. 2007) (finding plaintiff merely asserted a conflict of interest existed, but did not support that assertion with

any evidence).

Plaintiff has not offered "significant evidence" demonstrating the insurer's decision was motivated by self interest.  Plaintiff's characterization of Dr. Hatipoglu and Dr. Rolla as "pet reviewers" is an assertion unsupported by any record evidence.  In fact, Plaintiff undermines its assertion in a footnote to her brief in support.  There, Plaintiff states "every physician in Michigan refused to do an IME for UNUM" and "Defendant had to use an independent doctor service provider to get to Dr. Rolla."  (Plaintiff's Brief at 6 n. 2.)  Such efforts do not imply that Dr. Hatipoglu and Dr. Rolla are part of Defendant's stable of pet reviewers.[20]

### E.  EFFECTS OF MEDICATIONS

Plaintiff argues the plan administrator failed to consider the effects of the medications Plaintiff has been taking.  (Plaintiff's Brief at 23.)  Plaintiff cites *Smith v. Continental Casualty*.  In *Continental Casualty*, the plaintiff asked the insurer to reconsider the denial of benefits and supported the request with a letter from a doctor who listed all the prescribed medications and opined that the plaintiff could not function under any circumstances while under the influence of the medications.  450 F.3d at 264.  The Sixth Circuit concluded the insurer and the district court failed to consider the impact the various medications the plaintiff was taking had on her ability to perform her job.  *Id.* at 265.

On the record, the Court cannot conclude Plaintiff's decision to terminate benefits was arbitrary or capricious on this point.  Both Dr. Friedman and Dr. Hatipoglu opined that Plaintiff's medications may have interfered with some of her early test results.  Both Dr. Hatipoglu and Dr. Rolla did thus consider Plaintiff's medications.  Both doctors concluded, to the extent Plaintiff may

---

[20]Parenthetically, the court notes that such disparaging comments regarding medical professionals <u>without evidence</u> are not well received by this Judge.

have endocrine problems, the treatments she received should have resolved the problems or at least rendered her able to work.  As Defendant relied on the recommendations and conclusions of Dr. Hatipoglu and Dr. Rolla, who did consider the impact of the medications, the force of Plaintiff's argument is undermined.

### F.  CONSIDERATION OF THE AWARD OF SOCIAL SECURITY BENEFITS

Plaintiff argues Defendant should have reopened the administrative record to consider her award of social security benefits.  (Plaintiff's Brief at 24-25.)  Plaintiff argues Defendant urged her to apply for the benefits, which were awarded on December 8, 2006.  Plaintiff "continues to respectively [sic] take issue with Judge Wendell Miles' opinion and order of July 20, 2007, wherein he denied plaintiff's motion to remand the case to UNUM for consideration of the social security award." (*Id.* at 25.)

As outlined in Judge Miles' opinion and order (Dkt. No. 17), the Social Security Administration (SSA) awarded Plaintiff benefits on December 8, 2006, more than three months after Defendant denied Plaintiff's appeal for benefits and more than one month after this action was filed. The Sixth Circuit has held, as referenced by Judge Miles, that the district court may only consider the evidence that was before the plan administrator at the time (December 2005) the benefits decision was rendered.  *Wilkins v. Baptist Healthcare Sys., Inc.* 150 F.3d 609, 615  (6th Cir. 1998). *See also Buchanan v. Aetna Life Ins. Co.*, 179 F.App'x 304, 306 (6th Cir. 2006) (same) and *Raskin v. UnumProvident Corp.*, 121 F.App'x 96, 101 (6th Cir. 2005) (explaining the court's decision was not affected by the award of social security benefits because the plaintiff's "successful pursuit of those benefits is not contained in the record, which is the only evidence that we review").

### IV.  CONCLUSION

Initially, Plaintiff requested long term disability benefits due to pituitary dysfunction and adrenal insufficiency. Plaintiff's request for benefits was supplemented to include diagnoses of postural orthostatic problems and tachycardia, which Dr. Derks opined formed a basis for rending Plaintiff disabled and unable to perform even sedentary activities. Defendant relied upon an independent medical examination and then a file review of Plaintiff's medical records to terminate her benefits and deny her appeal. As explained above, the medical opinions upon which Defendant relied form a sufficient basis for concluding Plaintiff's endocrine abnormalities should not cause her to be totally disabled from performing any job. However, neither of the medical opinions upon which Defendant relies conclude Plaintiff's orthostatic problems and tachycardia should not cause her to be totally disabled from performing any job. In fact, Dr. Rolla recommended additional testing to determine the cause of those symptoms.

On the record before the Court, Defendant's justification for denying Plaintiff's long term disability benefits is arbitrary and capricious. Defendant's attempt to use the reports from physical therapy session to undermine a diagnosis from three different physicians who examined Plaintiff is not reasoned or rational. The doctor who treated Plaintiff at the therapy clinic did not examine Plaintiff for tachycardia or orthostatic problems, did not treat her for those problems, and did not comment on those problems. Defendant may disagree with the diagnosis, but the record does not reveal any doctor who concludes Plaintiff does not suffer from a postural orthostatic condition or tachycardia or any doctor who opines that these conditions have not rendered Plaintiff totally disabled and unable to perform any job. On the other hand, there is evidence in the record that Plaintiff suffers from those conditions and at least one doctor has opined that those conditions have rendered her unable to perform any job.

29

# ORDER

Defendant Provident's motion (Dkt. No. 23) for judgment affirming ERISA determinations is **DENIED.** Plaintiff Magers' motion (Dkt. No. 24) for judgment on the record is **GRANTED. IT IS SO ORDERED.**


Date:__October 16, 2008__                         __/s/ Paul L. Maloney_____
                                                  Paul L. Maloney
                                                  Chief, United States District Judge